793 So.2d 336 (2001)
Kevin LEMAIRE and Ned Wilson
v.
CIBA-GEIGY CORPORATION, Ken Dupuis, Karlene Tierney, Murry McMillan.
No. 1999 CA 1809.
Court of Appeal of Louisiana, First Circuit.
June 22, 2001.
*340 Stephen M. Irving, Joseph J. McKernan, J. Chandler Loupe, Baton Rouge, LA, Patrick W. Pendley, Plaquemine, LA, Wendell H. Gauthier, James R. Dugan, II, Bruce C. Dean, Metairie, LA, for plaintiff-appellee, Kevin Lemaire.
Henry B. Alsobrook, Richard J. Kernion, Jr., Joseph P. Gordon, Donald C. Massey, New Orleans, LA, F. Barry Marionneaux, F. Charles Marionneaux, Plaquemine, LA, for defendant-appellant, CIBA-GEIGY.
BEFORE: GONZALES and PETTIGREW, JJ., and ROTHSCHILD,[1] J. Pro Tempore.
PETTIGREW, Judge.
In this case, plaintiff was engaged in environmental cleanup activities at defendant's chemical manufacturing facility and was exposed to toxic and hazardous substances. Following a trial on the merits, the jury allocated 100 percent of the fault for plaintiff's injuries to defendant and awarded damages accordingly. Defendant now appeals. For the reasons set forth below, we affirm.

FACTS
At all times pertinent hereto, defendant, CIBA-GEIGY Corporation ("CIBA-GEIGY"), owned and operated a chemical manufacturing facility in St. Gabriel, Louisiana, that manufactured and packaged an agricultural herbicide known as Atrazine. As a result of this production process, there were various wastes that required treatment and disposal. At CIBA-GEIGY's St. Gabriel plant, wastewater streams were directed to sand bed filter ponds that were intended to be a settling basin for the wastewater. Once the solids were removed from the wastewater, the remaining water was pumped out for further treatment and ultimate discharge into the Mississippi River. As the quantity of solids in *341 the sand bed filter ponds increased, the ponds would eventually need to be cleaned out and the solids taken away for disposal.
Prior to 1984, CIBA-GEIGY accomplished this task using a method whereby limekiln dust was spread on the ponds to absorb the excess water. Earthmoving equipment was then used to dig out the remaining sludge, which was loaded into trucks and taken offsite. In late 1983, CIBA-GEIGY learned of a new way to clean the ponds using a belt press that would squeeze water from the sludge, thereby reducing the total volume of material to be removed. After a 30-day trial period of using a belt press owned by IT Corporation to clean one of the ponds at the St. Gabriel plant, CIBA-GEIGY determined that this new process would be more economical than the method they had been using. Thus, in early 1984, CIBA-GEIGY sought bids from various contractors to clean one of the sand bed filter ponds at the St. Gabriel plant.
IT Corporation was among those companies bidding on the job. Plaintiff, Kevin Lemaire, was an employee of IT Corporation at the time. IT Corporation was awarded the contract with CIBA-GEIGY, and Lemaire and the IT Corporation crew began the cleanout process of sand bed filter pond number one on March 20, 1984. Lemaire was a "lead man" on the job and worked closely with the crew removing the sludge from the pond and running it through the belt filter press, where the excess water was squeezed out and the compressed solids were collected in a dumpster for disposal in a landfill.
Lemaire, who had worked for IT Corporation as a technician since 1982, took a very active role in the cleanup of the sand bed filter pond. According to Lemaire, he would spend a "good part of the day" working in the dumpsters shoveling sludge from one end of the dumpster to the other. There were times when the sludge would not only get in his hair, ears, and nose, but it would also get in his shoes/boots, socks, underwear, and gloves. In addition to working in sand bed filter number one, Lemaire testified that on several occasions during the job, he had traversed a ditch that ran from the incinerator pond directly to the Mississippi River. Lemaire also had occasion to utilize the restroom, break area, and control unit, all of which were located in the same general area where the sludge was being processed.
Approximately two months after beginning the job at CIBA-GEIGY, Lemaire was hospitalized on May 14, 1984, with complaints of nausea, vomiting, diarrhea, headaches, and nostril burning. A urinalysis done upon Lemaire's admission to the hospital revealed no blood in the urine, but did show a + 1 reading for protein in the urine.[2] Lemaire was discharged four days later with a diagnosis of gastroenteritis or food poisoning. Lemaire returned to work at CIBA-GEIGY for approximately three weeks in a supervisory position. His symptoms continued during this time, and in August of 1984, Lemaire was hospitalized again with the same complaints. According to Lemaire, when he complained about the symptoms he was experiencing to Murry McMillan, a chemical engineer employed by CIBA-GEIGY, McMillan told him they were probably caused by the heat and gave him some salt tablets.
Lemaire became concerned over the source of his health problems. In fact, after his first hospitalization, Lemaire used *342 a glass jar to collect a sample from the contents of the sand bed filter pond where he had been working. He kept the sample in a plastic bag and stored it at his house until January of 1985 when it was analyzed by IT Corporation. The pesticide analysis of the sample revealed the presence of 33,200 parts per million of Atrazine. According to Lemaire, he was still employed by IT Corporation at this time and continued to have health problems including proteinuria (protein in the urine), hematuria (blood in the urine), and back pain associated with his kidneys. Lemaire was subsequently treated by several doctors for both physical and mental problems that he developed as a result of his exposure to certain chemicals at the CIBA-GEIGY St. Gabriel plant. According to the record, Lemaire not only had problems with recurrent proteinuria and hematuria, but also developed a fear of cancer, anxiety, and insomnia.
Lemaire indicated that he was not the only one on the job who was experiencing these types of symptoms. John Olinde, another IT Corporation employee, testified that he worked with Lemaire in cleaning out sand bed filter pond number one. Olinde stated that while on the job, he began developing symptoms such as stomachaches, diarrhea, occasional headaches, breakouts of acne on his back, and one instance of blood in his stool. According to Olinde, these symptoms persisted on and off during the three to four months he worked at the St. Gabriel plant. Olinde also noted that Lemaire had complained of headaches and stomach discomfort during this time. Harry Munster, another IT Corporation employee working on the CIBA-GEIGY job, testified that he had diarrhea "a couple of times" and that another employee named "Shelton" had constant stomachaches and was "always running to the bathroom."

PROCEDURAL HISTORY
On May 11, 1985, Lemaire[3] instituted the present action against CIBA-GEIGY, Ken Dupuis, Karlene Tierney, and Murry McMillan for the injuries he sustained as a result of his exposure to toxic and hazardous substances at the CIBA-GEIGY St. Gabriel plant. Lemaire alleged that while working on an environmental cleanup crew at the St. Gabriel plant from March through mid-June of 1984, he "sustained severe and permanent injuries, including various gastro[-]intestinal problems, hematuria and other serious and permanent injuries throughout [his body] from exposure to high levels of toxic and hazardous substances." In a supplemental and amending petition, Lemaire asserted that he was exposed to "toxic and hazardous chemicals including but not limited to Atrazine, Arsenic, Carbon Tetrachloride, Chloroform, Galecron, Chlordimeform 2, Amino-5, and Cloro-toluene." He added that he "now has an increased risk and increased predisposition to cancer including cancer of the bladder; renal problems, including total renal failure and/or cancer of the kidneys and increased risk of other serious illnesses all of which has caused [him] severe mental and emotional distress."
After extensive discovery and numerous pre-trial motions, the matter proceeded to a jury trial on July 27, 1998. Prior to receiving evidence on the merits, the trial court heard arguments and evidence concerning various preliminary motions in limine and motions to strike. In addition, the parties filed motions to limit and/or exclude the testimony of certain expert *343 witnesses, all of which were denied by the trial court.
The jury began hearing the merits of the case on July 31, 1998. At the conclusion of Lemaire's case, CIBA-GEIGY renewed its motion to exclude the testimony of two of Lemaire's experts. CIBA-GEIGY then moved for a directed verdict arguing that Lemaire was a statutory employee of CIBA-GEIGY. Further, CIBA-GEIGY moved for a directed verdict in its favor on the issues of negligence and intentional tort. After carefully considering these motions, the trial court denied the motion to exclude the expert testimony, denied the motions for directed verdict as to the negligence and statutory employee issues, and granted the motion for directed verdict as to the intentional tort issue. CIBA-GEIGY then presented its case to the jury and, at the close of its evidence, re-urged motions for directed verdict as to the negligence and statutory employee issues. Further, Lemaire moved for a directed verdict in his favor with regard to the third-party fault of IT Corporation. Lemaire argued that there was no evidence in the record to establish any fault on the part of IT Corporation. The trial court denied all motions.
Following deliberation, the jury returned a verdict on August 7, 1998, in favor of Lemaire. The jury found CIBA-GEIGY to be 100 percent at fault for the damages sustained by Lemaire and awarded damages in the amount of $428,200.00. The trial court signed a judgment in accordance with this verdict on September 14, 1998. CIBA-GEIGY moved for a judgment notwithstanding the verdict and/or a new trial, both of which were denied by the trial court. This appeal by CIBA-GEIGY followed, wherein the following specifications of error were assigned:
I. The trial court's refusal to grant a directed verdict in favor of appellant Ciba[-]Geigy on the issue of plaintiff-appellee's status as a statutory employee constitutes reversible error.
II. The trial court's refusal to submit the question of statutory employee status to the jury for decision constitutes reversible error.
III. The trial court failed to discharge its duty under the Daubert-Foret analysis for admissibility of expert testimony under La.C.C. art. 702, and allowed the testimony of Drs. Cone and Thoma[n] to be placed before the jury without any rational restriction or limitation, thus constituting reversible error.
IV. The jury's award of $420,000 in general damages, and the lower court's utilization of multiple, duplicative categories of damage, was an abuse of discretion and reversible error.
V. The jury's conclusion that plaintiff's employer, IT Corporation, was completely free of fault was an abuse of discretion and constitutes reversible error.

STATUTORY EMPLOYMENT DOCTRINE
The first issue presented for resolution in this litigation is whether CIBA-GEIGY was the statutory employer of Lemaire, and thus, immune from tort liability. In assignment of error number one, CIBA-GEIGY argues that the trial court erred in refusing to grant a directed verdict on the issue of statutory employment. In brief, CIBA-GEIGY asserts that in concluding CIBA-GEIGY was not Lemaire's statutory employer, the trial court erroneously applied the three-tiered analysis set forth in Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986), rather than the integral relation test articulated in *344 Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950). CIBA-GEIGY contends the Berry test, which was crafted by the Louisiana Supreme Court in 1986, cannot be applied retroactively to an incident that allegedly occurred in 1984. Instead, CIBA-GEIGY asserts that the integral relation test articulated in Sun Oil controls Lemaire's cause of action because the "integral relation test was the law of Louisiana at both the time of [Lemaire's] alleged injury and the time of his filing suit." CIBA-GEIGY further argues that the evidence clearly established that Lemaire's work was an integral and essential part of CIBA-GEIGY's business of producing chemicals, thus entitling CIBA-GEIGY to tort immunity.
In response, Lemaire asserts that the court correctly applied the three-tiered analysis set forth in Berry to the instant case in determining that CIBA-GEIGY was not the statutory employer of Lemaire. According to Lemaire, as early as 1983, "the Louisiana Supreme Court began a discernable shift from a liberal to a more restrictive construction of the statutory employer defense." Lemaire contends that in Berry, the court was simply interpreting the workers' compensation law as it existed at the time. Thus, argues Lemaire, the retroactive application of the Berry test "was not inequitable because it incorporated some of the factors that the courts have considered in determining statutory employment in the ten years preceding Berry."
In its second assignment of error, CIBA-GEIGY asserts that the trial court erred in refusing to instruct the jury on doctrine of statutory employment. CIBA-GEIGY contends that whether the work performed by Lemaire's direct employer was integrally related to CIBA-GEIGY's business is a question of fact for the jury to decide. Citing Solet v. K-Mart Corporation, 555 So.2d 35 (La.App. 1 Cir.1989), writ denied, 558 So.2d 572 (La.1990), Lemaire argues that the issue of whether an accident is work related is to be decided by the court and not by the jury. After reviewing the record and the applicable law, we agree with Lemaire's arguments regarding the issues addressed in CIBA-GEIGY's first two assisgnments of error.
Louisiana Code of Civil Procedure article 1810, which governs directed verdicts, states as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
In McNeely v. Ford Motor Company, Inc., 98-2139 (La.App. 1 Cir. 12/28/99), 763 So.2d 659, writ denied, XXXX-XXXX (La.4/28/00), 760 So.2d 1182, this court recently addressed the standard of review in determining whether a directed verdict is appropriate.
A trial court has much discretion in determining whether to grant a motion for directed verdict. A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the party opposing the motion, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. *345 However, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury.
On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Furthermore, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims.
McNeely, 98-2139 at 7-8, 763 So.2d at 664 (citations omitted).
Before this case was tried on the merits, CIBA-GEIGY raised the issue of its status as Lemaire's statutory employer as the basis for summary judgment in its favor. The trial court denied CIBA-GEIGY's motion for summary judgment, finding that the appropriate test for determining statutory employer status for a cause of action that arose in 1984 was the three-prong test set forth in Berry. The court further held that having applied the facts of this case to the Berry test, CIBA-GEIGY was not the statutory employer of Lemaire. The court concluded that the work performed by IT Corporation and Lemaire was of a specialized nature. CIBA-GEIGY applied for supervisory writs to this court under docket number 98 CW 1636. This court rendered the following decision on July 23, 1998:
WRIT DENIED IN PART; GRANTED IN PART. The writ is denied as to those portions of the trial court's ruling of July 7, 1998, denying relators' motion for summary judgment and determining that the "test" set out in Berry v. Holston Well Services [Service], Inc., 488 So.2d 934 (La.1986) is to be used to determine statutory employer status. This Court declines to exercise its supervisory jurisdiction. The issue of whether the "test" of Berry or of Thibodaux v. Sun Oil Company, [218 La. 453] 49 So.2d 852 (La.1950) should be applied can be raised on appeal after a ruling on the merits. However, that portion of the trial court's ruling finding that Ciba-Geigy Corporation is not the statutory employer of the plaintiff based on the facts of this case hereby is vacated and the issue Is remanded to the trial court for determination at trial on the merits. No pleadings were filed upon which to make such a ruling and the plaintiff never requested such a ruling.
Thereafter, the case proceeded to trial on the merits. At the conclusion of Lemaire's case, CIBA-GEIGY moved for a directed verdict arguing that Lemaire was a statutory employee of CIBA-GEIGY. The trial court denied the motion, noting that its position on this issue had remained unchanged since the original ruling on CIBA-GEIGY's motion for summary judgment. Again, at the conclusion of its case, CIBA-GEIGY moved for a directed verdict on this same issue, which motion was denied by the trial court.
Prior to the case being submitted to the jury for deliberation, CIBA-GEIGY requested that the jury be charged regarding the statutory employment doctrine and that a jury interrogatory concerning this issue be included in the verdict form. In denying CIBA-GEIGY's request, the trial court determined that it was for the court, not the jury, to decide the question of CIBA-GEIGY's statutory employer status.
Before we consider whether the trial court was correct in denying CIBA-GEIGY's motion for directed verdict, we will address the trial court's decision to consider the question of CIBA-GEIGY's statutory *346 employer status rather than instructing the jury regarding same.
It is well settled in Louisiana law that issue of whether an accident is work related is to be decided by the court and not by the jury. Solet, supra. In the Solet case, the plaintiff filed a tort suit against K-Mart, her employer, seeking recovery for an injury she sustained in the K-Mart cafeteria on her lunch hour. The case was tried by a jury, and one of the jury interrogatories dealt with whether the accident occurred within the course and scope of the plaintiff's employment. The jury determined that the accident did occur within the course and scope of the plaintiff's employment. This court found that the trial court erred by allowing the jury to decide whether the accident was work related.
A jury trial is not available in a worker's compensation proceeding. La. C.C.P. art. 1732. Consequently, the central issue of whether an accident is work related is always determined by the court in a worker's compensation suit. A determination of whether an accident is work related is tantamount to a legal determination of whether worker's compensation provides coverage. It would not be logical to bar a jury from hearing worker's compensation cases but allow them to decide the central issue of worker's compensation coverage. Depending upon the posture of the case and the manner in which the question is presented to the court, the court should at some point in the proceeding make the determination as a matter of law that the case is worker's compensation or tort. Only if it is determined by the court to be tort should the matter be presented to the jury.
Solet, 555 So.2d at 36-37 (emphasis added).
In the instant case, CIBA-GEIGY claimed it was entitled to tort immunity as Lemaire's statutory employer pursuant to the workers' compensation statutes. Lemaire denied that he was CIBA-GEIGY's employee. After considering the evidence, the trial court determined that Lemaire was not the statutory employee of CIBA-GEIGY, and, thus, no tort immunity was available. The court then submitted the remaining issues to the jury for a decision.
It is clear that as with the determination of whether an accident is work related, the question of statutory employer status is a question of law for the court to decide. The issue directly involves the workers' compensation statutes, namely La.R.S. 23:1061. Pursuant to La.Code Civ.P. art. 1732, no jury trial is available in such cases. Thus, the trial court was correct in refusing to allow the jury to decide this issue. Having so determined, we must now consider whether the trial court abused its "much" discretion in denying CIBA-GEIGY's motion for directed verdict on the statutory employment issue.
Under certain circumstances, an owner or principal can be held liable to pay workers' compensation to an employee of a contractor he engages. These circumstances are set forth in La.R.S. 23:1061.[4] *347 However, under such circumstances, workers' compensation is the exclusive remedy of the contractor's employee held to be a statutory employee of the principal, and the principal is immune from tort liability. La.R.S. 23:1032.[5]
On appeal, CIBA-GEIGY argues that the trial court erred in applying the Berry test to the facts of this case. CIBA-GEIGY contends that at the time of Lemaire's alleged exposure in 1984, the integral relation test set forth in Sun Oil, supra, was controlling. We disagree. There is a long line of cases wherein the Berry test was applied to causes of action that arose prior to May 20, 1986, the date on which the supreme court handed down the Berry decision.[6] Thus, in determining whether a statutory employment relationship exists in the present case, the facts must be analyzed according to the Berry three-tiered analysis.[7]
The Berry analysis requires an initial determination of whether the contract work is specialized or non-specialized. In order to make this determination, Berry directs that "courts should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field." Berry, 488 So.2d at 938. If the contract work is "specialized per se, as a matter of law the work is not a part of the principal's trade, business or occupation, and the principal is not the statutory employer of the specialized contractor's employees." Id. However, if the contract work is found to be non-specialized, "the inquiry shifts to a comparison of the principal's trade, business or occupation and the contract work to see if the latter can be considered a part of the principal's trade, business or occupation." Id. The Berry decision listed several factors that should be examined in order to resolve the factual issue of whether the contract work is part of the principal's trade, business or occupation:
1) "Is the contract work routine and customary? That is, is it regular and predictable?" Id.
The Berry court reasoned that general maintenance and repair work usually are within the scope of coverage of the worker's compensation statute while non-recurring *348 or extraordinary repairs are usually not within the scope of coverage.
2) "Does the principal have the equipment and/or manpower capable of performing the contract work?" Id.
Pursuant to this question, the Berry court explained that the essential determination is whether the contract work is ordinarily performed by the principal's employees.
3) "What is the practice in the industry relative to the contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work?" Id.
Again, the primary focus is whether the contract work is ordinarily handled by the principal's employees.
The last tier of the Berry analysis requires the court to decide whether the principal is engaged in the type of work being performed by the contractor at the time of the alleged accident.
Applying the Berry test to the facts of the present case, our analysis ends with the first level of inquiry, i.e., whether the contract work is specialized or non-specialized. Based on our review of the record, we find no manifest error in the trial court's factual finding that the work Lemaire was performing at the time of his exposure was specialized per se.[8] Thus, according to the Berry test, "as a matter of law the work is not a part of [CIBA-GEIGY's] trade, business or occupation, and [CIBA-GEIGY] is not the statutory employer of [Lemaire]." Berry, 488 So.2d at 938.
Michael King was the CIBA-GEIGY Utilities Effluent Operation Superintendent at the time in question. King testified that the cleaning of the sand bed filter ponds was usually contracted out, as CIBA-GEIGY did not have the necessary equipment and CIBA-GEIGY employees lacked the expertise and training. When asked why CIBA-GEIGY used contract workers for the cleaning of the sand bed filter ponds, King responded, "We didn't have expertise for the Belt Press at that time." King further indicated that CIBA-GEIGY "wanted to see if [the Belt Press] would work in cleaning out the pond", but that CIBA-GEIGY "didn't have a Belt Press readily available."
Additional evidence regarding the specialized nature of the work that IT Corporation and Lemaire were performing at CIBA-GEIGY was presented in Lemaire's testimony. When asked why he considered the work to be of a specialized nature, Lemaire stated:
[Y]ou had [to] know how to operate the filter press safely and all the equipment that went with it, the proper pressures, the aligning of the belts, and the injection of the polymer, all the accessories and equipment that went with it and how to make it work all in unison so that you had a feasible and a working job that you just didn't have a filter press sitting there.
Lemaire further indicated that he had received the requisite training to operate the belt press used for the CIBA-GEIGY job.
*349 After reviewing the record in its entirety, we conclude that the trial court was not manifestly erroneous in its finding that the work Lemaire was performing at CIBA-GEIGY was of a specialized nature. There is a reasonable factual basis in the record to support this finding and the conclusion that CIBA-GEIGY was not the statutory employer of Lemaire.[9] Thus, it was within the trial court's discretion to deny CIBA-GEIGY's motion for directed verdict on this issue. These assignments of error are without merit.

EXPERT TESTIMONY
In assignment of error number three, CIBA-GEIGY contends that the trial court erroneously allowed speculative and scientifically unsupportable testimony from Lemaire's experts, Drs. Cone and Thoman. CIBA-GEIGY alleges that although a trial court has "wide discretion in determining the competence of an expert witness ... that discretion was grossly abused in this case by the wholesale admission of the pseudo-science proffered by these witnesses."
Following a pre-trial hearing on the admissibility of the testimony of Drs. Cone and Thoman, the trial court found as follows:
I believe under Daubert, Foret, and all of the other Federal cases as well as Young, that [Drs. Cone and Thoman] can offer something, and I don't think they will be anymore confusing than experts normally are. And if you feel that their testimony isn't up to par as what you believe it should be[,] then as the cases say[,] we have cross examination.
All motions to exclude all experts are denied. Since they pass [the] Daubert case, when they take the stand I think theyI guess you can go through the qualifications but let's don't waste much time doing it.
At the conclusion of Lemaire's case, CIBA-GEIGY again moved to exclude the testimony of Drs. Cone and Thoman. The trial court denied the motion, stating that after "hearing the testimony of Dr. Thoman and Dr. Cone" and having conducted "an exhaustive research and study of the cases," its decision regarding the issue would remain the same.
The trial court has great discretion in determining whether to qualify a witness as an expert, and such discretion will not be disturbed on appeal in the absence of manifest error. Robinson v. Astra Pharmaceutical Products, Inc., 98-0361, 98-0362, p. 5 (La.App. 1 Cir. 3/31/00), 765 So.2d 378, 382, writ denied, XXXX-XXXX (La.6/2/00), 763 So.2d 607.
Louisiana Code of Evidence article 702 sets forth the general rule for the admissibility of expert testimony in Louisiana:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court examined the admissibility of new techniques as a basis for expert scientific testimony. The Louisiana Supreme *350 Court adopted Daubert, in State v. Foret, 628 So.2d 1116 (La.1993), mandating state courts to follow the same standards established by Daubert for federal courts.
The Daubert court concluded that the trial court is to act in a gate-keeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589, 113 S.Ct. at 2795. This requirement stems from a belief that the rules on expert testimony serve to relax "the usual requirement of first-hand knowledge" to ensure reliability on the part of a witness. This relaxation is justified so long as "the expert's opinion (has) a reliable basis in the knowledge and experience of his discipline." Foret, 628 So.2d at 1122 (citing Daubert, 509 U.S. at 590, 113 S.Ct. at 2796).
The reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." This connection is to be examined in light of "a preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." Foret, 628 So.2d at 1122 (citing Daubert, 509 U.S. at 590, 113 S.Ct. at 2796).
Suggestions as to how a court could fulfill its gate-keeping role include whether or not the technique had been subjected to peer review and/or publication, the "known or potential rate of error," the existence of "standards controlling the technique's operation," the technique's "refutability" or, more simply put, testability, and, finally, an incorporation of the earlier jurisprudential rule of general acceptance in the scientific community as but one factor in the analysis. Foret, 628 So.2d at 1122 (citing Daubert, 509 U.S. at 590, 113 S.Ct. at 2797).
Other rules of evidence govern expert testimony, namely, the balancing test of La.Code Evid. art. 403, which excludes probative evidence if outweighed by its potential for unfair prejudice.[10] Because there is a possibility that the expert's testimony can be quite misleading and prejudicial if this gate-keeping role is not properly satisfied, a flexible approach and a careful evaluation of the methodology surrounding the testimony and its conclusions is required. See Foret, 628 So.2d at 1122.
In exercising this gate-keeping function, the trial court properly conducted a preliminary hearing to determine the admissibility of the testimony of Drs. Cone and Thoman. After considering arguments from the parties, the trial court concluded that both Drs. Cone and Thoman qualified under the Daubert/Foret standards. We have thoroughly reviewed the evidence presented by the parties at the preliminary hearing as well as the actual testimony of these witnesses. We find no abuse of discretion in the trial court's decision to qualify Drs. Cone and Thoman as expert witnesses. Further, we are satisfied that the trial court complied with the requirements of Daubert/Foret in allowing Drs. Cone and Thoman to testify before the jury. Thus, this assignment of error is without merit.

*351 DAMAGES
We now turn to CIBA-GEIGY's argument that the general damages awarded by the jury were grossly excessive and unsupportable by the jurisprudence. As previously indicated, the jury awarded Lemaire $428,200.00 in damages. This award represented the following components of damages:

Past Medical Expenses $ 8,200.00
Future Medical Expenses $150,000.00
Past, present and future physical injury,
 pain and suffering or aggravation of
 pre-existing condition $150,000.00
Past, present and future mental pain
 and suffering $ 50,000.00
Past, present and future fear of cancer $ 40,000.00
Past, present and future loss of enjoyment
 of life $ 30,000.00
Total Award: $428,200.00

CIBA-GEIGY argues that only $8,200.00 of this award represents actual damages and that the remaining $420,000.00 "apparently represents the jury's response to Lemaire's appeal to sympathy, and simply cannot be justified in light of the paucity of evidence offered in support of these items of damage." CIBA-GEIGY further contends that the awards for mental pain and suffering and loss of enjoyment of life are duplicative of the jury's award for physical pain and suffering. In response, Lemaire asserts that the trier of fact is accorded much discretion in fixing general damages and that the jury's award in this case is supported by the record.
It is well settled that the trier of fact has much discretion in awarding damages. La.C.C. art. 2324.1. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The appellate court's first inquiry should be "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact." Youn, 623 So.2d at 1260. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn, 623 So.2d at 1261.
Lemaire testified at length about the physical and mental problems he has suffered since this incident. The first incidence of exposure-related symptoms that Lemaire endured was approximately two months after beginning the job at CIBA-GEIGY. Lemaire was hospitalized for four days with complaints of nausea, vomiting, diarrhea, headaches, and nostril burning. Lemaire was hospitalized again three months later with the same complaints. According to Lemaire's medical records, he has suffered from severe flank and kidney pain since his initial exposure at CIBA-GEIGY. Further, Lemaire has persistent proteinuria and hematuria, both of which have been attributed to his exposure to various chemicals at CIBA-GEIGY.
Lemaire stated that based on the information he has read concerning the effects of exposure to Atrazine and Galecron, he has developed a fear of cancer that has caused insomnia. Lemaire indicated that since 1988, he has averaged about three hours of sleep a night. He has been treated by a psychiatrist and has been prescribed sleeping pills and anxiety medication for his condition.
*352 One of Lemaire's treating physicians, Dr. James Cone, testified regarding Lemaire's injuries. Dr. Cone, who is board certified in internal medicine and occupational preventive medicine, indicated that a cystoscope performed on Lemaire revealed no evidence of any lesions in the bladder or kidneys. Thus, he concluded, the bleeding Lemaire was complaining of was coming from above the bladder in the kidney area. Dr. Cone testified that based on what he had reviewed, he believed Lemaire had been exposed to both Atrazine and Galecron, or Chlordimeform, which is a known human carcinogen. It was a combination of the effects of these exposures that have caused Lemaire's health problems. Further, Dr. Cone indicated that if Lemaire was exposed to Galecron, such exposure would result in an increased risk of cancer. Dr. Cone opined that Lemaire's kidney problems should be monitored for the remainder of his life with medical check-ups approximately every six months. Dr. Cone added that if Lemaire's condition did not improve, it may be necessary for him to undergo a kidney biopsy in the future. Dr. Cone could not say with any certainty whether Lemaire would, in fact, need such a procedure or what costs would be associated with same.
Another expert called on behalf of Lemaire was Dr. Mark Edward Thoman, a board certified toxicologist. Dr. Thoman testified that he had reviewed Lemaire's exposure history and medical records and believed that Lemaire had been exposed to Atrazine and possibly Galecron. Dr. Thoman indicated that he, too, believed Lemaire's medical problems were associated with his exposure to these chemicals.
With regard to the award of $150,000.00 for future medical expenses, CIBA-GEIGY argues that it is purely speculative. We note that while future medical expenses must be established with some degree of certainty, such an award is by nature somewhat speculative. Martino v. Sunrall, 619 So.2d 87, 91 (La.App. 1 Cir.), writ denied, 621 So.2d 821 (La.1993). After careful consideration of the record, we find no clear abuse of the jury's discretion in its award of $150,000.00 for future medical expenses. On review, we find the record supports the award, and we find no basis to upset the amount awarded.
Similarly, we will not disturb the jury's award for general damages. General damages are those which may not be fixed with any degree of pecuniary exactitude but that involve mental or physical pain and suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Angeron v. Martin, 93-2381, p. 3 (La.App. 1 Cir. 12/22/94), 649 So.2d 40, 43. This court has previously held that loss of enjoyment of life is a separate item of damages and independent from physical pain and suffering. See In re Medical Review Panel, 94-1661, p. 13 (La.App. 1 Cir. 6/23/95), 657 So.2d 713, 722.
Based on our review of the evidence contained in the record, we find sufficient evidence to support the jury's finding that Lemaire has suffered and will continue to suffer from the injuries he sustained as a result of this incident. We are satisfied that Lemaire's fear of cancer, anxiety, and insomnia are all reasonable given the fact that he was exposed to a known human carcinogen, Galecron, and Atrazine and its metabolites. While the damage award in this case may be on the high side, it is not so high as to constitute an abuse of the jury's vast discretion. Given the "particular injuries and their effects under the particular circumstances" on Lemaire, the jury's damage award is not beyond that which a reasonable trier of fact could assess. See Youn, 623 So.2d at 1260. *353 CIBA-GEIGY's assignment of error regarding damages is without merit.

ALLOCATION OF FAULT
In its final assignment of error, CIBA-GEIGY argues that the jury abused its discretion in finding IT Corporation completely free of fault. Citing La.R.S. 23:13, CIBA-GEIGY contends that IT Corporation had a fundamental duty to provide its employees with a safe place to work. CIBA-GEIGY maintains that IT Corporation's failure to discharge this duty cannot be ascribed to it. Further, CIBA-GEIGY asserts that IT Corporation "was on equal footing with [CIBA-GEIGY] in its ability to determine what materials its employees might be exposed to, and to decide how best to protect its employees."
In response, Lemaire contends "[t]he knowledge about the contents in the pond was possessed by [CIBA-GEIGY], but was not shared with IT Corporation or its employees." According to Lemaire, he inquired as to the contents of the sand bed filter pond and was told by Murry McMillan, a chemical engineer employed by CIBA-GEIGY, that it was calcium carbonate sludge, or lime. Lemaire maintains that CIBA-GEIGY "is solely responsible for [his] injuries and damages because it expressly or impliedly authorized [him] to work with, and be exposed to, the contents of the Sand Bed Filter Pond without the proper safety gear and without running the appropriate tests to identify the chemicals to which he was being exposed so that he could take appropriate precautions."
Murry McMillan testified that it was his understanding that the waste in the sand bed filter ponds was nonhazardous. McMillan indicated that the waste stream contained waste associated with the production of Atrazine, which would obviously include Atrazine. McMillan also acknowledged that in the summer of 1976, CIBA-GEIGY was manufacturing Galecron at the St. Gabriel plant. According to McMillan, waste from the Galecron production unit was directed from storage tanks to the liquid incinerator, then into the incinerator pond, and finally into a ditch that led to the Mississippi River. McMillan stated that CIBA-GEIGY stopped manufacturing Galecron because there was some concern expressed about its possible carcinogenic effects.
McMillan testified that in 1984, he did not believe there was any possibility that there was Galecron in the sand bed filter ponds where Lemaire was working. In fact, an analysis taken from sand bed filter pond number two in 1982 reported Galecron as "N/D" or "none detected." McMillan indicated that both sand bed filter pond number two and sand bed filter pond number one, the pond in which Lemaire had been working, received the same waste material. He did, however, note that when he was advised that Lemaire had hematuria, it "raised a red flag" because he knew that Galecron had been associated with hematuria. Nonetheless, McMillan stated that he did not take any steps to determine if there was any Galecron in the sand bed filter ponds because he "didn't expect there to be any."
McMillan also indicated that Lemaire and other IT Corporation employees were allowed to eat, drink, and take rest breaks in the area where the sludge was being processed. This activity was allowed by CIBA-GEIGY even though there were other areas of the plant where the work areas and break areas were kept separate. McMillan further testified that Galecron was detected in the ditch that Lemaire had traversed several times.
Robert Babb, a chemist employed by CIBA-GEIGY at the time in question, testified that CIBA-GEIGY toxicologist and plant physicians had advised them to monitor *354 their employees for hematuria and proteinuria as an indication of exposure to Galecron. The plant monitored urine samples of employees who worked in the Galecron unit or anyone who may have been exposed to it, even if in an incidental manner. It was Babb's understanding that Galecron was considered a carcinogen and was rapidly absorbed through the skin. According to Babb, hematuria and proteinuria had both been documented as being associated with exposure to Galecron. Babb agreed that Galecron was "renal toxic."
Jennifer Handy Bennett, a lab technician working for CIBA-GEIGY at the time in question, testified about CIBA-GEIGY's process of taking samples from various monitor wells in and around the plant and analyzing same. Bennett testified that the reports for monitor wells "M-1" and "M-2" revealed that there was Galecron in the monitor wells in 1983.
CIBA-GEIGY's Material Safety Data Sheets for both Atrazine (also called Atrazine Technical) and Galecron 4E (also called Chlordimeform) appear in the record. This information, however, was not provided to Lemaire or IT Corporation when they began the job at CIBA-GEIGY. With regard to Atrazine, the health hazard information is listed as follows:
EFFECTS OF OVEREXPOSURE:
Irritation of eyes, skin, nose or throat may result from overexposure to Atrazine Technical. If swallowed, nausea, vomiting or diarrhea can occur. Skin sensitization reactions may occur in sensitive individuals.
Long-term exposure to low levels of the material is not known to cause any ill effects in humans.
The heath hazard information for Galecron 4E is reported as follows:
EFFECTS OF OVEREXPOSURE:
Overexposure to Chlordimeform may affect the bladder, causing cystitis (inflammation) or hematuria (blood in the urine). Other symptoms may be nausea, vomiting, diarrhea, headache, dizziness, weakness, chills, fever, insomnia, nervousness, nosebleed or loss of appetite. A large single ingested dose has caused breathing difficulty, coma and death.
Galecron 4E is severely irritating to eyes. If swallowed, vomiting should be avoided as the petroleum solvent in this product, if drawn into the lungs, can cause chemical pneumonia.
It is well settled that the allocation of fault is a factual finding within the sound discretion of the trier of fact and is subject to the manifest error standard of review. Haydel v. Hercules Transport, Inc., 94-1246, p. 19 (La.App. 1 Cir. 4/7/95), 654 So.2d 418, 430, writ denied, 95-1172 (La.6/23/95), 656 So.2d 1019. We have thoroughly reviewed the record in the instant case and conclude that it was within the jury's discretion to assign 100 percent of the fault to CIBA-GEIGY. Thus, this assignment of error lacks merit.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is affirmed in all respects. All costs associated with this appeal are assessed against CIBA-GEIGY. AFFIRMED.
GONZALES, J., respectfully dissents and assigns reasons.
GONZALES, J., dissenting.
I respectfully dissent.
I disagree with the majority opinion on the admissibility of the expert testimony. As noted in EXPERT EVIDENCE: A PRACTITIONER'S GUIDE at 18, (Bert Black and Patrick W. Lee, eds., 1997):

*355 [Federal Rules of Evidence] Rule 702 consists of a single forty-eight-word sentence that lays out three tests, each of which must be met before a witness can testify as an expert. First, the subject of the testimony must be "scientific, technical, or other specialized knowledge"the knowledge test. Second, this knowledge must "assist the trier of fact to understand the evidence or to determine a fact in issue"the helpfulness test. Third, the witness must be qualified as an expert "by knowledge, skill, experience, training, or education"the qualifications test. The Rule also allows, but does not require, a qualified expert to testify in the form of an opinion.
Further, "[n]otwithstanding the interrelationship between the knowledge test and the helpfulness test, both must be satisfied before expert testimony is admitted into evidence." EXPERT EVIDENCE: A PRACTITIONER'S GUIDE at 20.
In oral reasons, the trial judge stated the following regarding his reasons for allowing Dr. Cone and Dr. Thoman to testify:
I thought I understood Foret and Daubert,... particularly after studying carefully because I had to in a recent... expropriation case where I had to exclude a witness after reviewing, memorizing Corboret.[[1]] ... I thought at first that Daubert was probably ... one of the toughest cases to come down in a long, long time. And I honestly thought that there wouldn't be but few people to ever pass the Daubert test. And when I read Daubert, and when I read Foret and Young, and it started going to the federal cases because that is where it all comes from according to Foret, persuasive but we don't have that much Louisiana jurisprudence on it. Vadala, In Re: Joint Eastern and Southern District Asbestosis litigation, Petruzzi's IGA Darling, In Re Paoli Railroad Yard, U.S. versus Bynum, Carroll versus Morgan, Wheat versus Pfizer, Inc., Cantrell versus GAF Corporation, Elkins versus Richardson-Merrel, which was interesting, was incredibly on point.[[2]] The adequacy *356 of animal studies to predict results in humans was allowed under the circumstances. Berry versus City of Detroit, Cook versus American Steamship, American and Foreign Insurance Company versus GE Company, on and on. Bradley versus Brown,[[3]] Sorensen versus Shaklee, and some more. I've got all the Federal cases if y'all ever want them right here.
Foret was [sic] case, and the crux in that case was that a psychologist stole from the jury the right to make a credibility call. And then it talked about Daubert. Daubert, after I finally read Daubert is where they were studying, they had groups of experts studying animals and a group studying humans, and incredibly I had to laugh because ... through out the opinions of the experts that studied the humans and said the people that studied the rats, we are going to accept that. I guess they were trying to say in that case they valued rats more than the humans.
Daubert pursuant to Foret says, look, we are going to use the federal [sic] because it's the same, 702, 701, and it's persuasive and we kind of like it. And Daubert says this rigid inflexible Frye test, which was never codified, it was just there. The Frye test and the general acceptance rule. And they said, no, that's to [sic] inflexible, we want more elasticity in it. And as a guide and if you look at Webster's Dictionary[,] a guide is exactly what you can imagine what it is, just information, a source to be considered, and is not rigid. As a matter of fact, Daubert says it's not a rigid test. All Daubert did is rather than tighten the screws on experts it simply said we're going to be more elastic, get away from the more rigid Frye test. And for your benefit here is a little guide that you can go by and you can consider with much discretion, it's there [for] your benefit.
Now, in essence, they otherwise qualify. I believe under Daubert, Foret, and all of the other Federal cases as well as Young, that these people can offer something, and I don't think they will be anymore confusing than experts normally *357 are. And if you feel that their testimony isn't up to par as what you believe it should be then as the cases say we have cross examination.
All motions to exclude experts are denied. Since they pass [the] Daubert case, when they take the stand I think theyI guess you can go through the qualifications but let's don't waste much time doing it.
The trial judge failed to apply the scientific knowledge rule and makes no mention of its four-part, non-exclusive tests of: 1) falsibility (whether the theory or technique can be, and has been, tested), 2) peer review, 3) the known or potential error rate, and 4) general acceptance of the methodology in the scientific community. This was legal error by the trial judge.
On direct examination, Dr. Thoman testified as follows:
Q. Going from humans back to rats and dogs. In the rat and dog studies that have been done on atrazine, can we find the same kind of problem?
A. We find similar problem[s], yes, where you have changes in the kidney tissue.
Q. Now, does that cause you to believe that what's going on with Kevin is essentially the same thing as ... what happened to the rats and the dogs.
A. It's parallel; yes.
This case is almost indistinguishable from General Electric Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). In that case, the United States Supreme Court determined there was no support for the extrapolation of evidence with regard to animal studies (mice) and the theory of plaintiff's expert that exposure to some mineral oil-based dielectric fluid used in electrical transformers, where the plaintiff got the fluid on his skin, in his eyes, and in his mouth, was a cause of plaintiff's small-cell lung cancer. In noting that unsupported leap, Chief Justice Rehnquist, writing for the court in General Electric Co. v. Joiner, 522 U.S. at 146, 118 S.Ct. at 519, stated:
Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.
The Supreme Court agreed with the trial court that the expert's testimony did not rise above "subjective belief or unsupported speculation." General Electric Co. v. Joiner, 522 U.S. at 140, 118 S.Ct. at 516.
In the present case, the testimony of Dr. Thoman was likewise unsupported. The cross-examination of Dr. Thoman shows that his theory has never been tested, and, since not tested, it has no error rate. He has not published anything for peers to review, and not only is his theory not generally accepted in the scientific community, he admits he is the only person with that belief.
In response to the fact that his theory has not been tested, plaintiff suggests, both by question[4] and by argument, that a *358 test on humans to support his theory is not possible. In General Electric Co. v. Joiner, as in this case, the experts admitted that the no study had demonstrated that PCBs led to cancer in any other species (humans). The Supreme Court in General Electric Co. v. Joiner, 522 U.S. at 144, 118 S.Ct. at 518, noted:
Respondent failed to reply to this criticism. Rather than explaining how and why the experts could have extrapolated their opinions from these seemingly far-removed animal studies, respondent chose "to proceed as if the only issue [was] whether animal studies can ever be a proper foundation for an expert's opinion."
Although it is correct that the specific test used on rats and dogs in the present case cannot be performed on humans, before there can be some extrapolation or correlation between the animal tests and causation on humans of similar injurious reactions, there must be some scientific knowledge to show this correlation. The General Electric Co. v. Joiner experts used the word "promoted" to describe the harmful effect of dielectric oil in causing small-cell cancer. Dr. Thoman said the effects on humans "paralleled" the effects on rats and dogs. Presumably this means that the effects on rats and dogs are the same as the effects on humans. Dr. Thoman's description of the animal tests fails to provide the dosage involved in those tests. Thus, there was no foundation disclosed by the record for the dosage administered to the intentionally exposed test animals and the level of exposure experienced by the plaintiff. Without this information, no comparison could be made by Dr. Thoman or anyone else. The General Electric Co. v. Joiner court was able to compare the dosages at issue therein. Such a comparison cannot be made herein. The effect on a human by a collision with a speeding gnat is significantly different from a collision with a speeding freight train. Comparisons of dosages is paramount, fundamental, and necessary.
In EXPERT EVIDENCE, A PRACTITIONER'S GUIDE at 150-151, the limits of animal testing and the problem of cross-species extrapolation is addressed as follows:
2. Limits of animal testing
Largely on the basis of expediency, regulators have for two decades supported their work almost exclusively with rodent tests. Rodent bioassays have also formed the foundation for claims of causation in toxic tort litigation. Most toxicologists, however, now recognize the significant problems that call into question the use of rodent test data for any courtroom purpose.
a. The problem of cross-species extrapolation
There can be no question that species differenceswhich include such characteristics as physical size, metabolism, and organ structure-alter the reaction to a suspected toxicant. Response to toxicants can vary dramatically even among *359 small rodent species.'" And few mammals are more different than man and the rat. "Man is not a big rat."
Metabolism of toxicants occurs at a much faster rate in small rodents than in humans. This difference in rates may be due to a number of physical factors, all of which support the proposition that the effects on rodents are much different from those on humans. For example, relative organ weights are different. "Rats [proportionately] have twice as much liver but three times less lung than man." Rats and humans also differ in chemical composition. Food intake is proportionately much higher in rats than in humans, which means that the rat's national requirements are different and that for their size they ingest much larger amounts of chemicals, natural or synthetic, per pound of body weight and per day. The result of these differences is to magnify the toxic effects of any exposure in the test animal.
Further distortion in rodent testing comes from the selection of test animals. For example, in cancer studies, scientists typically use highly inbred strains of rodents, which are fed ad libitum (that is, food is always available). The resulting test animal is obese and sluggish and three times more likely to develop a tumor than a counterpart on a more restricted diet. Moreover, "genetic drift" caused by the inbreeding has produced naturally obese rats and, in one strain, increased the lifetime expectation of developing a cancerous neoplasm from 10 to 80 percent. It is reasonable to question whether humans should be considered as behaving biochemically like obese, inbred, cancerprone rodents. [Footnotes deleted.]
There was no testimony to explain the correlation between the effects of chemical exposure on rats and dogs and the effects of chemical exposure on humans.
On cross-examination, Dr. Thoman testified in part as follows:
Q. Is this a true statement, "because a compound may have an affect on an organ in a particular species of animal, that does not mean it will affect, necessarily, the same organ in humans?"
A. That's correct.
Q. Now, in addition to being unaware of any article in the medical or scientific literature to suggest that atrazine, chlordimeform and hydroxyatrazine, somehow [interact] to cause damage to human kidneys, would it be fair to say that as far as you know, you are the first person in the world to come to that conclusion?
A. No, there's been other cases where people have had atrazine and chlordimeform in a non-published setting, i.e., poison  poisoning of patients that we see in a different clinical situation. But, as far as the literature, no, the literature does not have a study, as I said before.
Q. Okay. We already established that the literature doesn't have anything about it. My question was this, "Would it be fair to say that to your knowledge, you're the first person in the world to come to the conclusion that atrazine, hydroxyatrazine and chlordimeform interact somehow to cause damage to human kidneys"; is that fair to say?
MR. IRVING: Your Honor, I'm going to object. That calls for speculation. I mean he doesn't know what everybody in the world has come to.
MR. GORDON: To his knowledge.
THE COURT: But, what's in his knowledge. Overruled.
BY MR. GORDON:
Q. What was the answer to my question, is that yes or no? Are you

*360 A. To my knowledge
Q.the first person in the world to come to that conclusion?
A. In this particular fingerprint of a case history, probably in that case; yes.
Q. Okay. Not only is there nothing in the literature to support your conclusion, but you haven't written anything or published anything to give the scientific and medical community an opportunity to review your conclusion; have you?
A. No.
Q. And in point of fact, you've never written anything about this particular infraction; have you?
A. No.
Q. Would it be fair to say, that before reaching a conclusion as to whether or not a particular chemical can cause a particular injury, that among other things you have to consider the chemical and its structure, the dose and the time the person was exposed to it, and the temporal relationship between the onset of said dose and exposures?
A. Those are all reasonable considerations; yes.
Q. Okay. And in this particular case, you don't know the chemical and how they may interact?
A. Right.
In this cross-examination, Dr. Thoman, when asked about the Daubert tests, admitted that his theory was not generally accepted in the scientific community, and he admitted there was no peer review of this information because he had never published it. He also admitted there was no testing of his theories. Clearly, his theory fails the Daubert tests. Dr. Thoman failed to show how the studies on animals applied to humans.
On redirect examination of Dr. Thoman, none of the Daubert tests were addressed, and counsel for the plaintiff avoided the Daubert test and switched to a focus merely on standard of proof.
Q. Did you understand that theunderstand that the standard for proof in Louisiana is more probable than not?
MR. GORDON: Your Honor
A. I understand. I understand that.
THE COURT: Go ahead.
BY MR. MCKERNAN:
Q. In your opinion, is it more probable than not that Kevin Lemaire was exposed to chlordimeform?
A. Yes.
Q. In your opinion, is it more probable than not that Kevin Lemaire was exposed to atrazine?
A. Yes.
Q. Is it your opinion that it's more probable than not that he was exposed to hydroxyatrazine?
A. Yes.
(Emphasis added.)
Questions about exposure do not address the issue of causation of injury from that exposure.
To establish scientific validity, there must be a preliminary assessment of whether the reasoning or methodology is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Further, to establish reliability under Article 702, the court must apply the following factors: 1) whether the theory can and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) general acceptance in the scientific community; and 4) the known or potential rate of error of the specific scientific technique and the existence and maintenance of standards controlling the technique's operation. Daubert, 509 U.S. at 591-95, 113 S.Ct. at 2796-2797.
*361 Both Dr. Cone, an occupational medicine physician, and Dr. Thoman, a pediatrician, failed to demonstrate that their opinions comported with the basic tenets of toxicological methodology. The branch of science relevant to an expert's testimony that a chemical caused a plaintiff's illness is toxicology. Courts have held that even if an expert seeking to testify is not a toxicologist, he must employ principles and methods of toxicology if he is to give an opinion on an issue relating to that specialty. A central tenant of toxicology is that the "dose makes the poison" and that all chemical agents, including water, are harmful if consumed in large quantities. Mancuso v. Consolidated Edison Co. of New York, Inc., 967 F.Supp. 1437, 1445 (S.D.N.Y. 1997).
This method first requires that the expert determine the dosage of the toxin at issue to which the plaintiff was exposed. Second, the expert must establish "general causation," by demonstrating that, according to scientific literature, levels of the toxin comparable to those received by the plaintiff can cause the specific types of injuries he alleges. Third, the expert must establish specific causation, by demonstrating that, more likely than not, the toxin caused the plaintiff's injuries in this particular case. Critical to establishing specific causation is exclusion of other possible causes of the symptoms. See Mancuso, 967 F.Supp. at 1455-1456.
Dr. Cone admitted he did not know either the dose or concentration of Mr. Lemaire's exposure to atrazine or hydroxyatrazine. Nor could he identify the levels of exposure to these chemicals below which there is no effect in humans (the threshold limits). Dr. Thoman also admitted a lack of knowledge regarding the exposure levels of atrazine and hydroatrazine, and that there was a threshold limit below which there were insignificant effects on humans.
Although both these "experts" admit that the knowledge of the dose received is critical to an assessment of toxic exposure, they also admit they do not know the dose Mr. Lemaire received. How could Dr. Cone and Dr. Thoman, in sound science, tell the jury that Mr. Lemaire was exposed long enough to high enough doses to cause health problems, and that the problems were in fact caused by the exposure, when they do not know the dose he received?
Further, neither Dr. Cone nor Dr. Thoman made any attempt to exclude other possible causes of Mr. Lemaire's health complaints. It was undisputed at trial that Mr. Lemaire was exposed to chemicals in his previous work for other employers, including vinyl chloride, tetraethyl lead, TDI phosphoric acid, styrene monomer, chloryl ethylene, chromium nitrobenzene, ortho dichlorobenzene, PCB's, perchloroethylene, hydrocarbons, solvents, hexane, soda ash solution, algin, lindane, toxaphene, methoxychlor, peptachlor, endosulphur, PCDD, TCDF, chloraprene, 1/2-dichlorobutene, tolulene, chloroform and pechloroancreasal. Dr. Cone admitted Mr. Lemaire had been exposed to these chemicals in other employment, yet failed to explain how he excluded these other potential exposures from his findings in this case.
The trial court in this case abdicated its responsibility to act as a "gatekeeper," failed to apply the factors enunciated in Daubert and State v. Foret, 628 So.2d 1116 (La.1993), and erred by allowing any and all testimony go to the jury on the premise that "these people can offer something, and I don't think they will be anymore confusing than experts normally are." This was an abuse of discretion by the trial court.
In conclusion, the majority opinion correctly sets out some of the tests to be used in determining whether scientific knowledge *362 is being offered. However, the majority opinion fails to recognize that the trial court did not do this, and it fails to show how the opinions of the experts in this case were measured against these well-established tests, particularly in failing to show how the conclusion about causation jumps from the animal studies to applicability to humans. As noted above, there is no showing how this particular theory passed even one of the Daubert tests for scientific knowledge.
Since the opinions or theories advanced by the plaintiff's experts were not based on scientific knowledge, they were not reliable. Unreliable evidence is not helpful to the jury and the trial court abused its discretion in allowing this evidence to be presented. Obviously, without this testimony, an entirely different verdict would have been reached by the jury on the issue of causation. Accordingly, I would reverse.
Therefore, for the foregoing reasons, I respectfully dissent from the majority opinion.
NOTES
[1] Judge Walter J. Rothschild is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] According to the doctor who treated Lemaire, the urinalysis was negative for blood but showed a + 1 reading for protein. However, Lemaire testified that while he was in the hospital, the nurse from CIBA-GEIGY called him and told him that a CIBA-GEIGY employee had advised her that Lemaire was in the hospital with blood in his urine.
[3] Also included as a plaintiff in the original petition for damages was Ned Wilson. In an order signed on May 27, 1986, Wilson's claims against CIBA-GEIGY were dismissed with prejudice.
[4] At all times pertinent hereto, La.R.S. 23:1061 provided, in part, as follows:

Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which, he would have been liable to pay if the employee had been immediately employed by him....
[5] The exclusive remedy provision of La.R.S. 23:1032 provides, in pertinent part, as follows:

For purposes of this Section, the word "principal" shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.
[6] See, e.g., Croy v. Bollinger Machine Shop and Shipyard, Inc., 578 So.2d 945 (La.App. 1 Cir.), writ denied, 586 So.2d 532 (La.1991); Manuel v. Odeco, Inc., 563 So.2d 1179 (La.App. 1 Cir.), writs denied, 566 So.2d 401, 402 (La. 1990); Short v. Mobil Oil Corporation, 544 So.2d 572 (La.App. 1 Cir.1989); Ardoin v. BASF Wyandotte Corporation, 525 So.2d 684 (La.App. 1 Cir.1988); Hankins v. Woman's Hospital, 517 So.2d 217 (La.App. 1 Cir.1987), writs denied, 518 So.2d 511, 512 (La.1988).
[7] In Kirkland v. Riverwood Intern. USA, Inc., 95-1830, p. 13 (La.9/13/96), 681 So.2d 329, 336, the Louisiana Supreme Court noted that "the 1989 amendment [to La.R.S. 23:1061] was designed primarily to overrule the part of Berry dealing with specialization per se and to declare that a finding of specialization is not determinative of the absence of a statutory employment relationship." The Kirkland court noted that a majority of the appellate courts had determined that the 1989 amendments to La.R.S. 23:1061 was meant to overrule Berry. The court concluded, however, that the language of the 1989 amendment did not support such an interpretation.
[8] For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
[9] We note that even if we were to assume that the work Lemaire was performing at CIBA-GEIGY was not specialized, this conclusion would stand. An examination of the factors set forth in the second level of the Berry analysis results in a finding that the contract work performed by IT Corporation and Lemaire was not a part of CIBA-GEIGY's trade, business or occupation.
[10] Louisiana Code of Evidence article 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[1] The expropriation case apparently referenced by the trial court is Exxon Pipeline Company v. Hill, 99-0073 (La.App. 1 Cir. 6/23/00), 763 So.2d 144. In that case, the trial court used the four-part Daubert test to reach the conclusion that a real estate appraiser's testimony was inadmissible. See Exxon Pipeline Company v. Hill, 99-0073 (La.App. 1 Cir. 6/23/00), 763 So.2d 144, 151, rev'd., 2000-2535, 2000-2559 (La.5/15/01), 788 So.2d 1154. (Finding that [the real estate appraiser's] qualifications to testify on the value of the subject property "fails on all four tests" elaborated in Daubert, the trial court concluded that the real estate appraiser's testimony was inadmissible.) This determination was ultimately upheld by the Louisiana Supreme Court, despite a contrary position taken by this court. Id.
[2] The trial judge's reliance on Elkins v. Richardson-Merrell, Inc., 842 F.Supp. 996 (M.D.Tenn.1992), aff'd by Elkins v. Richardson-Merrell, Inc., 8 F.3d 1068 (6th Cir.Tenn. 1993), is incredibly misplaced. In Elkins (a trial court ruling made in 1992 prior to both Daubert and Joiner), the defendant's motion for summary judgment was granted. The defendant Richardson-Merrell (apparently the same Merrell in Daubert) opposed the admissibility of testimony on the issue of the causal relationship between the use of the prescription drug Bendectin and birth defects. The judge in Elkins relied upon Turpin v. Merrell-Dow Pharmaceuticals, Inc., 959 F.2d 1349 (6th Cir.1992), which had also excluded testimony about the connection between animal studies and birth defects in humans. The Elkins judge, noting that the evidence in Turpin was virtually identical to the evidence at issue in the case before him, adopted the following reasons of the Turpin court:

Here, the record's explanation of the animal studies is simply inadequate. Although the animal studies themselves may have been scientifically performed, the exact nature of these tests is explained only in general terms. The record fails to make clear why the varying doses of Bendectin or doxyalamine succinate given to the rats, rabbits and in vitro animal cells would permit a jury to conclude that Bendectin more probably than not causes limb defects in children born to mothers who ingested the drug at prescribed doses during pregnancy. The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue of human birth defects is too wide. Under such circumstances, a jury should not be asked to speculate on the issue of causation.
Elkins, 842 F.Supp. 996 (M.D.Tenn.1992), aff'd by Elkins v. Richardson-Merrell, Inc., 8 F.3d 1068 (6th Cir.Tenn.1993), citing Turpin, 959 F.2d at 1360.
The trial judge in the present case is correct, the Elkins case is incredibly on point; however, the Elkins case supports the defendant's position to exclude the testimony, not the plaintiff's position to admit it. The next two cases cited by the trial court, following his statement about adequacy of animal studies to predict results in humans was allowed, Berry v. City of Detroit, 25 F.3d 1342 (6th Cir.1994), cert. denied, 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995) and Cook v. American Steamship Co., 53 F.3d 733 (6th Cir.1995), do not involve animal studies.
[3] Apparently relying upon Bradley v. Brown, 852 F.Supp. 690 (N.D.Ind.1994) to support the admission of the expert testimony, the trial court seems to say that the expert testimony at issue in Bradley was allowed into evidence. However, in Bradley, 852 F.Supp. at 697-698, the court refused to allow the plaintiffs' expert testimony, determining that the plaintiffs failed to establish the cause of their medical condition, and, thus, the expert opinion regarding whether the plaintiffs' exposure caused their symptoms "would be entirely too subjective and speculative."
[4] The following discourse took place during Dr. Thoman's direct examination:

Q. Now, is it possible to testcan you do a human test of exposure to chlordimeform and atrazine together?
A. Only in retrospect, where you have patients that might have been exposed to chlordimeform and atrazine, but to have a patient or group of people having exposure to chlordimeform and atrazine, it's generally not recommended to experiment on people that way.
Q. Thewould you recommend that anybody come in contact with any amount of chlordimeform?
A. No.
Q. And why is that?
A. It'sit's not a natural product. It's not a natural thing that occurs in our system, and any particular exposure to anything that could potentially cause our system to be altered and/or changed, could be potentially troublesome. Again, the time and the dose would be a factor.
Q. Basically, could we sum up what you see happening here is that what happened to Kevin was just like what happened to the rats and dogs?
A. It's parallel; yes.