PATRICIA RIVET MURRAY, Judge.
 

 | ¶ This is a tort suit arising out of a work place accident. The sole issue raised on appeal is whether the trial court correctly concluded that the defendant, The Folger Coffee Company (“Folger”), was the statutory employer of the plaintiff, Donald Dominio. Answering that question in the affirmative, we affirm the trial court’s judgment dismissing Mr. Dominio’s tort suit and declaring the intervention filed by his direct employer, T.T.C., Inc., moot.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 In June 1993, Mr. Dominio was injured at Folger’s warehouse. He was attempting to move out of the way of a forklift that was rapidly backing out of a truck.
 
 *957
 
 As he moved out of the way, he tripped and fell. At that time, Mr. Dominio was employed as a truck driver by T.T.C., a professional employee leasing company. However, Mr. Dominio was working for Arcadian Motor Company (“Arcadian”). T.T.C., as explained elsewhere in this opinion, leased Mr. Dominio to Arcadian.
 

 lain June 1994, Mr. Dominio filed this tort suit against Folger alleging its negligence caused his injuries. Folger answered the suit and denied liability. T.T.C. intervened seeking to recover the workers’ compensation benefits it had paid.
 

 In September 2004, Folger filed a motion for summary judgment on the basis that it was Mr. Dominio’s statutory employer and therefore immune from tort liability. In November 2004, the trial court granted Folger’s motion for summary judgment. From that judgment, Mr. Dominio and T.T.C. appealed. In February 2006, this court reversed and remanded.
 
 Dominio v. Folger Coffee Co.,
 
 05-0357 (La.App. 4 Cir. 2/15/06), 926 So.2d 16 (hereinafter
 
 “Dominio I
 
 ”).
 

 In
 
 Dominio I,
 
 this court held that the applicable statutory provision for determining whether Folger was Mr. Dominio’s statutory employer was the 1989 version of La. R.S. 23:1061! Under La. R.S. 23:1061,
 
 [1]
 
 a statutory employer is defined as a principal who has contracted others to perform work “which is a part of his trade, business, or occupation.” In 1989, the Legislature amended this statute to add the following language:
 

 The fact that work is specialized or nonspeeialized, is extraordinary construction or simple maintenance, is work that is usually done by contract or by the principal’s direct employee, or is routine or unpredictable, shall not prevent the work undertaken by the principal from being considered part of the principal’s trade, business, or occupation, regardless of whether the principal has the equipment or manpower capable of performing the work.
 

 ^Construing the 1989 version of La. R.S. 23:1061, the Louisiana Supreme Court in
 
 Kirkland v. Riverwood Int’l USA, Inc.,
 
 95-1830 (La.9/13/96), 681 So.2d 329, held that to determine whether contract work is a part of the alleged principal’s trade, business, or occupation, such that the principal will be considered a statutory employer, the trial court must consider “all pertinent factors under the totality of the circumstances.”
 
 Kirkland,
 
 95-1830 at p. 14, 681 So.2d at 336. Among the factors to be considered in determining whether a statutory employment relationship exists are the following:
 

 (1) The nature of the business of the alleged principal;
 

 (2) Whether the work was specialized or non-specialized;
 

 (3) Whether the contract work was routine, customary, ordinary, or usual;
 

 (4) Whether the alleged principal customarily used his own employees to perform the work, or whether he contracted out all or most of such work;
 

 (5) Whether the alleged principal had the equipment and personnel capable of performing the contract work;
 

 (6) Whether those in similar businesses normally contract out this type of work or whether they have their own employees perform the work;
 

 
 *958
 
 (7) Whether the direct employer of the claimant was an independent business enterprise who insured his own workers and included that cost in the contract; and
 

 (8) Whether the principal was engaged in the contract work at the time of the incident.
 

 Kirkland,
 
 95-1830 at pp. 14-15, 681 So.2d at 336-337.
 

 14Applying the
 
 Kirkland
 
 test, we found in
 
 Dominio I
 
 that summary judgment was inappropriate because of the existence of the following genuine issues of material fact:
 

 • The nature of the direct employer’s— T.T.C.’s and Arcadian’s — business.
 
 See Oubre v. Union Carbide Corp.,
 
 99-63 (La.App. 5 Cir. 12/15/99), 747 So.2d 212 (requiring consideration of the nature of the business of not only the principal, but also the direct employer).
 

 • Whether Mr. Dominio’s work was specialized or unspecialized given that he possessed a commercial driver’s license (“CDL”).
 

 • Whether Folger had equipment and personnel capable of performing the contract work.
 

 • Whether those in similar businesses normally contract out this type of work or whether they have their own employees perform the work.
 

 In June 2007, Mr. Dominio and T.T.C. filed a motion for summary judgment on the basis that Folger could not meet its burden of proving at trial its affirmative defense that it was Mr. Dominio’s statutory employer. Denying the motion, the trial court reasoned that there were issues regarding whether a contract existed between Folger and Mr. Dominio’s direct employer and whether a sufficient number of the
 
 Kirkland
 
 factors were met. Mr. Dominio and T.T.C. filed an application for supervisory writ, which this court denied.
 
 Dominio v. Folger Co.,
 
 07-1353 (La.App. 4 Cir. 1/16/08).
 

 In June 2008, a three-day bench trial was held in this case.
 
 [2]
 
 At trial, Mr. Domi-nio testified that Arcadian initially hired and paid him; however, after the first year, he began receiving his paychecks from T.T.C. Mr. Dominio further | ^testified that he was paid by the load ($25 per load). Arcadian required that he have a CDL license, which is the equivalent to a commercial driver’s license. Arcadian dispatched him not only to Folger, but also to other companies. Mr. Dominio had worked for Arcadian for about five and a half years before the accident occurred. On the day of the accident, his job was going back and forth from Folger’s main plant to its depot. The accident occurred at the depot when Mr. Dominio was assisting Folger employees to load coffee into his trailer.
 

 Folger introduced into evidence, in lieu of live testimony, the deposition testimony of T.T.C.’s designated representative under La. C.C.P. art. 1442, Paul Richards. Mr. Richards, an attorney, testified that T.T.C. had been in bankruptcy since September 2001 and that it was no longer in business. He described T.T.C. as a professional employee leasing company (also known as a professional employer organization) that provided essentially payroll processing type services to trucking companies. Since Mr. Dominio was employed by Arcadian when T.T.C. started providing
 
 *959
 
 its services to Arcadian, Mr. Dominio was transferred from Arcadian’s payroll to T.T.C.’s payroll, but continued to work for Arcadian. At the time of the accident, Mr. Dominio was on T.T.C.’s payroll, employed by T.T.C., but also employed by Arcadian because he was doing Arcadian’s work. Stated otherwise, for payroll purposes, Mr. Dominio was T.T.C.’s employee; however, he worked for and was employed by Arcadian, T.T.C.’s customer. As Folger points out, Arcadian was Mr. Dominio’s
 
 de facto
 
 employer; whereas, T.T.C. was his
 
 de jure
 
 employer.
 

 | pFolger had no contract with T.T.C. Folger’s contractual relationship was with Mr. Dominio’s
 
 de facto
 
 employer, Arcadian. Folger called two witnesses at trial to address the nature of its contractual relationship with Arcadian, and, as a result thereof, its status as Mr. Dominio’s statutory employer: Bart Blackston and Melinda Umbarger.
 

 Mr. Blackston testified that in 1993 he was Folger’s customer packaging warehouse department manager. Mr. Black-ston explained that although Folger’s main plant had a 120,000 square feet warehouse, it was not large enough to store the quantity of product that the company needed to ship nationally. (He testified that Folger ships about ninety percent of all its product out of its New Orleans site.) To provide additional warehouse space, Folger leased an 80,000 square foot satellite warehouse, which it called the depot. The depot was located about a half a mile west of the main plant. Folger used the depot to house approximately forty percent of its inventory. Mr. Blackston’s responsibilities included managing the depot.
 

 Mr. Blackston’s responsibilities also included managing Folger’s drop lot.
 
 [3]
 
 He explained that the drop lot, which by agreement with Arcadian was located at Arcadian’s yard, was put into place to expedite the process of moving product from the main plant to the customers by allowing for pre-loading of trailers. The preloaded trailers were placed on the drop lot, which allowed customers to pick up |7their loads at the drop lot. The drop lot thus avoided customers having to wait for their loads at the main plant.
 

 Mr. Blackston testified that Mr. Domi-nio frequently worked as a shuttle driver. Mr. Blackston defined a shuttle driver as an “individual that moved trailers back and forth between the Gentilly warehouse [Fol-ger’s main plant] and the depot, the depot and the drop lot, and the drop lot to Gentilly.” He noted that this route was akin to an intra-company triangle and that “the shuttle driver moved throughout that triangle to make the business work.” He testified that Arcadian was critical to Fol-ger’s day-to-day business operations and that Mr. Dominio, as an Arcadian employee, likewise was critical to Folger’s operations and part of its business.
 

 Folger’s second witness on the statutory employment issue was Ms. Umbarger. Ms. Umbarger testified that Folger is a wholly owned subsidiary of Proctor and Gambel (“P & G”). In 1993, Ms. Umbar-ger was employed at P & G’s headquarters in Cincinnati, Ohio, as site transportation leader for Folger’s New Orleans plant. In that position, she purchased all of the finished product transportation services, which included warehousing services, drop lot services, and over-the-road movement of the product. Ms. Umbarger testified that she managed the movement between Folger’s warehouse locations to make P &
 
 *960
 
 G’s business more efficient and profitable. She explained that logistics — -which means movement management — has to do not only with information flow, but also with Isproduct flow. Part of her role as a logistics manager was to make sure the product reaches the shelf.
 

 Ms. Umbarger, tracking Mr. Blackston’s testimony, defined the depot as an additional satellite warehouse that Folger uses because the main plant facility has only a small warehouse. She defined the drop lot as simply another warehouse where the company stores loaded and unloaded trailers. She testified that the drop lot served the function of making the company more efficient in loading at the plant and that “[o]wnership of the product remains with Proctor and Gambel until that load moves off the drop lot.” She distinguished a shipment from a move. She defined a move • as taking place within the intra-company triangle of Folger’s plant, its depot, and its drop lot. Whereas, she defined a shipment as an over-the-road move of the product to a customer distribution center.
 

 Ms. Umbarger acknowledged that in 1993 Folger owned no trucks or trailers and employed no truck drivers. Thus, in order to move product between the main plant, the depot, and the drop lot she had to purchase shuttle transportation services. In 1993, Folger contracted with Arcadian for such shuttle transportation services. Ms. Umbarger clarified that Folger had two separate contracts with Arcadian: a transportation contract and a drop lot contract. The transportation contract was to proride over-the-road services to deliver the product to third parties. The drop lot contract was to provide shuttle services between Folger’s main manufacturing plant, its depot warehouse, and its drop lot. At the time of the accident, Mr. Dominio was employed by Arcadian as a shuttle driver providing Udrop lot services to Folger. The relevant contract for purposes of this case is thus the drop lot contract. Ms. Umbarger testified that at the time of the accident a written drop lot contract existed between P & G (Folger) and Arcadian and that she managed the drop lot contract from P
 
 &
 
 G’s headquarters. She acknowledged that the written contract was destroyed by P & G’s administrative personnel as a part of the company’s routine annual records retention program.
 

 Following the trial, the trial court took the matter under advisement. In June 2009, the trial court rendered judgment finding Folger to be Mr. Dominio’s statutory employer and thus immune from tort liability. This appeal followed.
 

 DISCUSSION
 

 Folger, who asserted as an affirmative defense its immunity from tort liability, bore the burden of proving by a preponderance of the evidence its entitlement to the immunity.
 
 Rowe v. Northwestern Nat’l Ins. Co.,
 
 471 So.2d 226, 228 (La.1985). The trial court found, after a bench trial, that Folger met its burden of proof. Mr. Dominio and T.T.C. contend that the trial court legally erred in finding Folger met its burden. The initial issue we must address is the applicable standard of review of the trial court’s finding.
 

 Because the issue of statutory employment status is generally decided in the context of a motion for summary judgment, there is scant jurisprudence addressing the standard of review of a trial court’s finding after a trial on the merits of statutory employment status.
 
 See Brewton v. Underwriters Ins. Co.,
 
 02-2852, p. 5, |inn. 2 (La.6/27/03), 848 So.2d 586, 589 (observing that typically such employment status issues are resolved by pre-trial motion).
 

 
 *961
 
 The issue of statutory employment status is a mixed question of law and fact. William E. Crawford, 12
 
 La. Civil Law Treatise, Tart Law
 
 § 27:51 (2d ed.2009);
 
 Bassett Furniture Indus., Inc. v. McReynolds,
 
 216 Va. 897, 899, 224 S.E.2d 328, 324 (1976)(noting that issue of whether an independent contractor’s activities constitute a part of an owner’s trade, business, or occupation is a mixed question of law and fact that must be resolved in light of the facts and circumstances of each case).
 
 [4]
 
 In
 
 Reed v. Wal-Mart Stores, Inc.,
 
 97-1174 (La.3/4/98), 708 So.2d 362, 364, the Louisiana Supreme Court held that the manifest error standard of review is the proper standard to be applied to the mixed question of law and fact presented by a determination of whether a defect presents an unreasonable risk of harm. In so holding, the Supreme Court reasoned:
 

 Because a determination that a defect presents an unreasonable risk of harm predominantly encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-than-scientific standard, a reviewing court is in no better position to make the determination than the jury or trial court. Consequently, the findings of the jury or trial court should be afforded deference.
 

 |
 
 iiId.
 
 Similar logic dictates that the manifest error standard of review is the proper standard to be applied to the determination of statutory employment status under the
 
 Kirkland
 
 test.
 

 In the
 
 Kirkland
 
 case, the Louisiana Supreme Court held that “[o]nce the Legislature declared in 1989 that no single factor is determinative, the fact-based nature of the inquiry virtually necessitates a multi-factored, case-by-case factual inquiry under the totality of the circumstances.”
 
 Kirkland,
 
 95-1830 at p. 15, 681 So.2d at 337. Given the fact-intensive nature of the multi-factored
 
 Kirkland
 
 test coupled with the less-than-scientific nature of the “part of his [the principal’s] trade, business, or occupation” standard under La. R.S. 23:1061, we find the applicable standard of review is the manifest error standard.
 
 See Dupre v. Exxon Pipeline Co.,
 
 93-1528, p. 5 (La.App. 3 Cir. 6/1/94), 638 So.2d 1118, 1121 (citing
 
 Lewis v. Exxon Corp.
 
 441 So.2d 192 (La.1983), for the proposition that a trial court’s finding on the question of statutory employment is a factual one that should not be disturbed on appeal absent manifest error); H. Alston Johnson, 13
 
 La. Civil Law Treatise: Workers’ Compensation Law and Practice, Malone & Johnson
 
 § 126 (3rd ed.l994)(noting that “the question of whether the work performed by the contractor is part of the principal’s business is of course one of fact, which in debatable situations involving a tort claim is an issue for the jury’s determination”).
 

 
 *962
 
 In finding Folger to be Mr. Domi-nio’s statutory employer, the trial court in its reasons for judgment made the following factual findings:
 

 |12* Folger was in the business of manufacturing, shipping, distributing, and selling coffee. Ms. Umbarger, Fol-ger’s site transportation manger, purchased transportation services to move the “finished product” to its ultimate destination.
 

 • Mr. Dominio’s work was specialized because the transportation of Folger’s products required him to possess a commercial driver’s license (CDL) — a level of skill, training, and experience not normally possessed by those other than motor carriers.
 

 • The transportation services performed by Mr. Dominio, under his contract, were routine and ordinary. Mr. Domi-nio was responsible for moving trailers between the Folger warehouse, depot, and drop lot. For several years, Mr. Dominio delivered and received loads at the Folger depot — moving approximately ten to fifteen loads per day. Mr. Dominio’s contract required him to transport trailers filled with coffee to long-haul drivers that later transported Folger’s coffee in interstate commerce.
 

 • Folger did not possess the trucks necessary or directly employ truck drivers to transport their coffee through their plant-centered triangle. When Folger needed product transportation services, they contracted with Arcadian to handle their drop-lot operations, warehouse services, and their over-the-road movement. Folger contracted out its transportation services in order to reduce non-value added costs and to improve efficiency at its loading plants. According to Ms. Umbarger, it was common within the industry to contract out this process.
 

 • Mr. Dominio was a direct employee of T.T.C., on loan to Arcadian. T.T.C. was a professional employer organization that provided workers’ compensation insurance for its employees. T.T.C. passed the cost of this insurance on to Arcadian in their contract and Arcadian, in turn, charged Folger a fixed cost to cover workers’ compensation insurance.
 

 • At the time of the accident, Mr. Domi-nio was assisting Folger employees to load coffee into his trailer. Mr. Domi-nio was injured at a Folger warehouse when he tripped attempting to move out of the way of a moving forklift.
 

 Considering the above factual findings, the trial court determined that under the totality of circumstances Mr. Dominio was Folger’s statutory employee. The trial court reasoned that “after comparing the nature of the contracted work with the routine and customary process by which Folger transported their products, and the prevailing industry custom, it was clearly shown at trial that Mr. Dominio’s work was part of Folger’s trade, business, or occupation.”
 

 | |oOn appeal, Mr. Dominio and T.T.C. contend that the trial court factually and legally erred in its application of the
 
 Kirkland
 
 test. They contend that the proper analysis under the •
 
 Kirkland
 
 test is twofold. First, the facts regarding each factor must be examined and a determination made as to whether each factor supports or negates a statutory employment relationship. Second, the factors supporting a statutory employment relationship must be weighed against the factors negating such a relationship. They contend that the following six of the eight
 
 Kirkland
 
 factors negate a statutory employer relationship: factor 1 — Folger’s business is the manufac-
 
 *963
 
 taring of coffee, not transportation; factor 2 — Mr. Dominio was performing specialized work; factor 3 — the contract work performed by Mr. Dominio was not routine, customary, ordinary, or usual; factor 4 — Folger did not customarily use its own employees to perform the contract work of transportation; factor 5 — Folger had neither the equipment nor personnel capable of performing the contract work; and factor 8 — Folger was not engaged in the contract work of transportation at the time of the incident. As to the other two factors, they contend there was no conclusive evidence presented at trial: factor 6 — that similar business normally contract out transportation work; and factor 7 — that Arcadian passed along the cost of workers’ compensation insurance to Folger.
 

 Under the
 
 Kirkland
 
 test the question of whether the work being performed by the employee of the subcontractor was part of the alleged principal’s trade, business, or occupation is the central issue.
 
 Janes v. Vela’s Garage & Rental Inc.,
 
 97-2486, pp. 4-5 (La.App. 4 Cir. 5/27/98), 717 So.2d 246, 248. The
 
 Kirkland
 
 test is based on the totality of the circumstances taking into consideration all pertinent factors. The eight enumerated factors are not exclusive. “The presence or absence of any one factor is not determinative, and the presence of one factor may 114compensate for the lack of another.”
 
 Kirkland,
 
 95-1830 at p. 14, 681 So.2d at 336. Thus, the resolution of statutory employment status under the
 
 Kirkland
 
 test does not, as Mr. Dominio and T.T.C. suggest, turn on a numerical count of how many of the eight enumerated factors support or negate statutory employment status.
 

 The trial court found the nature of Fol-ger’s business encompassed the manufacturing, shipping, distributing, and selling coffee. The record supports this finding. Ms. Umbarger testified that the manufae-taring of coffee brought Folger into the warehousing and shipping business because once the coffee was packed Folger needed to store it before it was shipped to the customer. Folger’s main plant lacked sufficient warehouse space. Folger thus needed to move its product on a regular basis within its intra-company triangle — its main plant, depot, and drop lot. To do so, Folger contracted with Mr. Dominio’s
 
 de facto
 
 employer, Arcadian for this transportation service.
 

 Insofar as the nature of the direct employer’s business, Mr. Dominio’s
 
 de jure
 
 employer, T.T.C., was as an employee leasing company. It is undisputed that Folger had no contract with T.T.C. and that T.T.C. leased Mr. Dominio to Arcadian.
 

 The trial court found Mr. Dominio’s work specialized because the transportation of Folger’s products required him to possess a commercial driver’s license (CDL) — a level of skill, training, and experience not normally possessed by those other than motor carriers. The trial court nonetheless found that the contract work was routine, customary, ordinary, or usual. Both sides suggest the trial court’s findings on these two factors were inconsistent.
 
 See Jackson v. Latini Machine Co.,
 
 960 F.Supp. 1043, 1048 (E.D.La.1997)(de-fining “specialized” in this context to mean “work done apart from the principal’s usual trade, business, or | ^occupation.”) An analysis of the nature of the work Mr. Dominio was providing establishes that the trial court’s findings on these two factors can be reconciled.
 

 “Delivery and transportation cases turn largely on common-sense considerations of whether the delivery activity was routine or extraordinary for this type of business.” 4
 
 Larson’s Workers’ Compensation Law
 
 § 70.06[8] (2009). Folger was in the business of manufacturing coffee. “The ordinary rule is that a manufacturer’s business
 
 *964
 
 ceases with the manufacture of the good, that the trucker who picks up the finished good for delivery to one or more of the manufacturer’s customers is not the statutory employee of the manufacturing firm.”
 
 Larson’s, supra.
 
 The ordinary rule is in-apposite because Mr. Dominio’s work did not include delivering Folger’s coffee over-the-road to the customer. Rather, Mr. Dominio’s work pursuant to the drop lot contract involved routinely driving between three very specific points: Folger’s main plant, its depot, and its drop lot. As the trial court noted, Mr. Dominio averaged ten to fifteen loads a day at the depot.
 

 Folger’s business included not only manufacturing, but also warehousing its product. At the time of the accident, Folger’s warehousing operation was managed by both a local manager, Mr. Blackston, and a corporate headquarters manager, Ms. Um-barger. Both of these managers testified at trial regarding the routine nature of the transportation services Mr. Dominio provided to Folger pursuant to the drop lot contract with his
 
 de facto
 
 employer, Arcadian. Common-sense considerations support the trial court’s conclusion that such intra-company transportation service, involving the shuttling of a company’s goods from one company warehouse site to another, was a regular part of Folger’s business.
 

 Folger concedes that at the time of the accident it had neither the equipment nor the trained employees (truck drivers having a CDL) to perform the | ^transportation work at issue. Mr. Domi-nio and T.T.C. contend that Folger’s lack of its own employees capable of performing the transportation work at issue precludes a finding of statutory employment. In support, they cite language from a footnote in
 
 Kirkland
 
 that the true test for statutory employment is “whether this indispensable activity is, in that business, normally carried on through employees rather than independent contractors,”
 
 Kirkland,
 
 95-1880 at p. 14, n. 14, 681 So.2d at 336. We disagree.
 

 In 1989, the Legislature expressly provided that a finding of statutory employment is not precluded “regardless of whether the principal has the equipment or manpower capable of performing the work.” La. R.S. 23:1061 (1989 version);
 
 see also Cantrell v. BASF Wyandotte,
 
 506 So.2d
 
 793
 
 (La.App. 1st Cir.1987)(affirming finding of statutory employment status despite that the specific job done by security guard had always been contracted out). Ms. Umbarger testified that it was more efficient for Folger to contract out these services. Ms. Umbarger further testified that Folger contracted out these services to reduce costs and for efficiency reasons. Ms. Umbarger still further testified that other companies in the industry contract out this type of work.
 

 The trial court found that T.T.C. passed the cost of the workers’ compensation insurance on to Arcadian as part of their contract; and Arcadian, in turn, charged Folger a fixed cost to cover workers’ compensation insurance. The record supports this factual finding. Mr. Richards, T.T.C.⅛ designated representative, testified that the costs of workers’ compensation insurance would have been one of the items that T.T.C. passed on to its customer, Arcadian. Ms. Umbarger testified that she negotiated the drop lot contract with Arcadian and that she therefore knew that Arcadian charged their insurance costs, including workers’ | ^compensation costs, to P
 
 &
 
 G. Although the written contract could not be produced at trial because it had been destroyed, Ms. Umbarger testified that she was sure the contract provided for the workers’ compensation cost. She explained that all of Folger’s vendors were required to provide certificates of insurance on a regular basis. If a vendor had
 
 *965
 
 failed to provide such certifícate of insurance, she could have nullified the contract with them. She testified that this was never an issue with Arcadian.
 

 Folger was engaged in the contract work at the time of the incident. The accident occurred when Mr. Dominio was assisting Folger employees to load coffee into his trailer. At that time, Mr. Dominio was helping his
 
 de facto
 
 employer, Arcadian, perform the contract work of providing drop lot services-moving coffee between Folger’s three warehouse locations: its main plant, depot, and drop lot.
 

 We conclude that the record contains sufficient evidence to support the trial court’s finding that under the
 
 Kirkland
 
 test — the totality of the circumstances— Mr. Dominio was performing work that was a part of Folger’s business. The trial court’s finding that Folger was Mr. Domi-nio’s statutory employer therefore was not manifestly erroneous.
 

 DECREE
 

 For the forgoing reasons, the judgment of the trial court is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Although in 1997 the Legislature amended La. R.S. 23:1061, Section 3 of Acts 1997, No. 315 provides that the provisions of the Act, which overruled
 
 Kirkland v. Riverwood Int’l USA, Inc.,
 
 95-1830 (La.9/13/96), 681 So.2d 329, “shall be applied prospectively only and shall not apply to any cause of action arising prior to the effective date of this Act.”
 

 [2]
 

 . The trial court struck Mr. Dominio’s request for a jury trial. Both this court and the Louisiana Supreme Court denied Mr. Domi-nio’s and T.T.C.’s writ application contesting this ruling.
 
 Dominio v. Folger Co.,
 
 07-0172 (La.App. 4 Cir. 2/12/07),
 
 writ denied,
 
 07-0541 (La.4/27/07), 955 So.2d 697.
 

 [3]
 

 . Mr. Dominio's attorney stipulated that "other companies around the country had drop lots."
 

 [4]
 

 . The jurisprudence has indicated that the determination of statutory employer status is a question of law for the court to decide.
 
 See Ramos v. Tulane University of Louisiana,
 
 06-0487, p. 3 (La.App. 4 Cir. 1/31/07), 951 So.2d 1267, 1269 (citing
 
 Trent v. PPG Indus. Inc.,
 
 03-1068, p. 7 (La.App. 3 Cir. 2/4/04), 865 So.2d 1041, 1047);
 
 Prejean v. Maintenance Enterprises, Inc.,
 
 08-0364, p. 5 (La.App. 4 Cir. 3/25/09), 8 So.3d 766, 769 (citing
 
 Ramos,
 
 supra). This statement, as Folger points out, can be traced to the holding in
 
 Lemaire v. CIBA-GEIGY Corp.,
 
 99-1809, pp. 10-11 (La.App. 1 Cir. 6/22/01), 793 So.2d 336, 346, that the question of statutory employer status is a legal one for the trial judge, not the jury to decide. The
 
 Lemaire
 
 court based its holding on La. C.C.P. art. 1732, which provides that a jury trial is unavailable in a workers’ compensation case. The Louisiana Supreme Court in
 
 Brewton v. Underwriters Ins. Co.,
 
 02-2852 (La.6/27/03), 848 So.2d 586, overruled
 
 Le-maire
 
 and held that disputed issues of employment status in a tort suit filed in district court are for the jury to decide. The
 
 Trent
 
 case, cited in
 
 Ramos, supra,
 
 and
 
 Prejean, supra,
 
 simply quoted the language from the
 
 Lemaire
 
 case.